**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles Clover, | No. CV-23-00153-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| DGL Group Limited, Shenzhen Hyleton Technology Company Limited, Shenzhen Fuyuandian Power Company Limited, Walmart Incorporated, and Unknown Parties, | |
| Defendants. | |

Plaintiff Charles Clover woke one morning to the sound of a smoke detector in his home. After investigating the source, he found his grandson's hoverboard in flames. Clover put out the fire but not before stepping on batteries that fell from the hoverboard's charred remains, resulting in severe injuries.

Clover brought a complaint against defendants DGL Group Ltd., the distributor of the hoverboard, and Walmart, Inc., the seller of the hoverboard, alleging design, manufacturing, and warning defects. Clover also alleged a general negligence claim. Defendants moved for summary judgment on all claims and on one aspect of damages should any claim survive. Their motion is granted in part and denied in part.

**I.     Background**

A crucial aspect of this case involves Clover owning two different models of hoverboards. Clover's grandson R.C. initially used a hoverboard known as the Hover-1

1  Liberty. The Liberty model used a 42-volt charger, which was included when purchased.
2  (Doc. 86-2 at 5.) A family friend broke that hoverboard and on July 12, 2019, the friend
3  bought a replacement of a different model. (Doc. 86-1 at 18.) The replacement was a
4  Hover-1 All-Star. (Doc. 81 at 1; Doc. 86-1 at 16.) The All-Star model used a 29-volt
5  charger, which was also included when it was purchased. (Doc. 81-5 at 4; Doc. 86-2 at 5.)
6  Although the two models used different chargers, the plug from the 42-volt charger, *i.e.*
7  the Liberty charger, could be inserted into the charging port of the All-Star.

8       The user manual for the All-Star contained multiple warnings regarding use of the
9  proper charger and charging cable, but the warnings differed in potentially important ways.
10 (Doc. 81-5 at 104.) One warning stated "[u]se only the supplied charger with this scooter,"
11 indicating Clover should use only the 29-volt charger. (Doc. 81-4 at 4.) But other warnings
12 stated "[u]se only the charger and charging cable supplied by Hover-1," and "[o]nly use
13 the charger provided by Hover-1." (Doc. 81-4 at 21–22.) From Clover's point of view, both
14 the 42-volt and 29-volt chargers had been "supplied" or "provided" by Hover-1. Clover—
15 and likely R.C.—did not read the user manual. (Doc. 81-5 at 104.)

16      The record does not include definitive evidence whether the 42-volt charger
17 included a warning label. A charger for a "similar model" of hoverboard purchased on
18 eBay had a warning label attached to the charging cord. That warning said: "[p]lease make
19 sure this charger is suitable for your device before charging." (Doc. 81-5 at 102.) The 42-
20 volt charger used by R.C. on the night before the fire, however, does not appear to have
21 had a warning label at the time of the fire, nor did other similar 42-volt chargers. (Doc. 85-
22 3 at 2–3.) Viewed in the light most favorable to Clover, the 42-volt Liberty charger in this
23 case did not include a warning label.

24      R.C. kept the Liberty charger at Clover's house and the All-Star charger at his
25 mother's house. (Doc. 81-5 at 3.) On December 26, 2020, R.C. used the All-Star board at
26 Clover's home before plugging it in to charge overnight with the Liberty charger. (Doc. 86-
27 1 at 19; Doc. 81-5 at 3, 41–42.) Around 7:30 the next morning, Clover woke to the sound
28 of a smoke detector and found his house filled with smoke. (Doc. 86-1 at 13.) After running

downstairs to investigate, he saw "the front of [his] couch was on fire" with the hoverboard also in flames "sitting in front of the couch." (Doc. 86-1 at 13.) Clover could not tell "how much flame was the board burning and how much flame was the couch burning." (Doc. 86-1 at 22.)

Clover picked up the hoverboard and felt a searing pain on his right foot. (Doc. 86-1 at 13–14.) He looked down to see he had stepped on "glowing red batteries on the floor." Clover then threw the hoverboard outside, doused the remaining flames in water, put his "foot in the sink to run cold water over it," and said "'darn' or words to that effect." (Doc. 86-1 at 14.) Clover did not call the fire department because his experience in "mountain rescue" prepared him to extinguish the "simple fire" of approximately "24 inches wide." (Doc. 86-1 at 21.) In December 2022, Clover filed this suit state court. It was removed to federal court the following month.

## II.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant makes its initial showing, the burden shifts to the nonmovant to demonstrate (1) the existence of a genuine factual dispute, *i.e.*, one in which the evidence is such that a reasonable jury could return a verdict for the nonmovant, and (2) that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

## III.    Strict Products Liability

"In order to establish a *prima facie* case of strict products liability, the plaintiff must

1  show that the product is in a defective condition and unreasonably dangerous, the defective
2  condition existed at the time the product left the defendant's control, and the defective
3  condition is the proximate cause of the plaintiff's injury." *Gosewisch v. Am. Honda Motor*
4  *Co.*, 737 P.2d 376, 379 (Ariz. 1987). Arizona law recognizes "[t]hree types of defects can
5  result in an unreasonably dangerous product: (1) design defects, (2) manufacturing defects,
6  and (3) informational defects encompassing instructions and warnings." *Id.* Clover alleges
7  the hoverboard suffered from all three types of defects.

### A. Design and Manufacturing Defect

9   Clover alleges the hoverboard suffered from a design defect, a manufacturing
10  defect, or both. In his opposition to the motion for summary judgment, Clover presents a
11  confused mixture of arguments, sometimes identifying discrete attributes of the hoverboard
12  as alleged defects but also arguing Clover need not provide "proof of a specific defect."
13  (Doc. 86 at 7.) Ultimately, proper resolution of the motion for summary judgment
14  regarding the design and manufacturing defect claims turns on Arizona law recognizing
15  that no particular defect need be identified.

### 1. Design Defect

17  According to Clover's opposition, summary judgment is not appropriate on his
18  design defect claim because the hoverboard's design allowed it "to connect to a higher
19  voltage charger and/or the battery management system failed to protect from overheating."
20  (Doc. 86 at 6.) Clover later explains these alleged defects include that "different voltage
21  rated chargers and charging cables" did not have "different type[s] of connector[s]." (Doc.
22  86 at 8.) Clover also seems to argue the chargers and charging cables were defective
23  because they were not differentiated by color. (Doc. 86 at 8.) And finally, the design was
24  defective because the hoverboard did not include "alerts and alarms" that would indicate if
25  "the wrong voltage, amperage" were being used during charging. (Doc. 86 at 9.) Clover
26  does not point to any admissible evidence in support of these alleged defects.
27  Instead of evidence, Clover offers argument it "would have been feasible and would
28  not have impaired the usefulness of the product or made it unduly expensive" to make all

1  the design changes he identifies. (Doc. 86 at 9.) Clover does not explain the factual basis
2  for these assertions. Although Arizona law does not require expert testimony in every
3  design defect case, it is needed where "factual issues are outside the common
4  understanding of jurors." *Rossell v. Volkswagen of Am.*, 709 P.2d 517, 524 (Ariz. 1985);
5  *see, e.g.*, *Golonka v. Gen. Motors Corp.*, 65 P.3d 956, 966 (Ariz. Ct. App. 2003) (expert
6  testified an audible warning "would be 'very effective'"). In this case, Clover does not
7  provide expert testimony regarding the feasibility (including cost) of the many design
8  changes he believes should have been made to the hoverboard. The design considerations
9  for the exact features Clover identifies are outside the common understanding of jurors.
10 Because he does not have expert evidence supporting the particular design defects he
11 identifies, Clover cannot pursue those theories of design defect.

**2.  Manufacturing Defect**

Although again not entirely clear, Clover appears to base his manufacturing defect claim on the manufacture of the hoverboard's battery management system ("BMS"). (Doc. 86 at 9.) Clover argues "[i]f the BMS worked as intended, it would have prevented overcharging outside of its safety limits and, hence, the fire." (Doc. 86 at 9.) Clover does not acknowledge this argument contradicts his own position that the hoverboard had a defective design based on the lack of proper BMS. But regardless, Clover's manufacturing defect theory is based on testimony from his expert that undercuts rather than supports Clover's theory.

Clover cites portions of his expert's deposition where the expert was discussing a test he conducted using a hoverboard of the same model as Clover's All-Star. The expert connected that exemplar hoverboard to a 42-volt charger and observed the hoverboard did not charge. (Doc. 86-3 at 10.) Based on that, the expert concluded "[t]he BMS [in Clover's hoverboard] was defective and failed to protect against overcharging." (Doc. 86-7 at 2.) Clover's expert does not provide a sufficient basis to reach such a conclusion.

As he admitted during his deposition, Clover's expert has never designed a BMS, had never tested a BMS before this case, and does not know "how to test" a BMS under a

common industry standard. (Doc. 86-3 at 11.) Even more specifically, the expert has no knowledge how the BMS in the exemplar hoverboard, presumably of the same design as the BMS in Clover's All-Star, was designed. The BMS in the exemplar hoverboard did not allow the battery to charge using an incorrect charger. Based on that, the expert testified "I don't know if it was designed like that or not, but [the BMS on the exemplar hoverboard is] definitely not allowing voltage to go into the battery and charge – charge the battery." (Doc. 87-1 at 3.) Without knowing how the hoverboard's BMS was designed, the expert has no factual basis to conclude the All Star hoverboard's BMS in this case suffered from a manufacturing defect. In other words, if the expert does not know how the BMS was designed, he has no basis to state Clover's hoverboard was manufactured in a different manner than intended. Clover's manufacturing defect theory based on the BMS is not viable.

### 3. Disputes of Fact on Strict Liability

Clover's contradictory attempts to identify an exact design or manufacturing defect that caused the fire are not supported by sufficient evidence and defendants are entitled to summary judgment on those portions of the design and manufacturing defect claims. But Clover also argues Arizona law "does not require direct proof of negligence but rather requires evidence to support an inference . . . that negligence was more likely than not the cause of the accident." (Doc. 86 at 7.). Clover is correct.

Under Arizona law, "no specific defect need be shown if the evidence, direct or circumstantial, permits the inference that the accident was caused by a defect." *Dietz v. Waller*, 685 P.2d 744, 747–48 (Ariz. 1984). Requiring "direct evidence" of a defect is inappropriate "in cases such as this one where the product has disintegrated or burned up." *Id.* at 746. When a plaintiff is unable to identify the exact defect and is attempting to "prov[e] a defect through circumstantial evidence, 'a plaintiff is not required to eliminate with certainty all other possible causes of an accident . . . . ' Rather, the plaintiff need only 'present evidence sufficient to allow the trier of facts to reasonably infer that it was more probable than not that the product was defective.'" *Allstate Ins. Co. v. Ford Motor Co.*, No.

CV-08-2276-PHX-NVW, 2010 WL 1654145, at *17 (D. Ariz. Apr. 21, 2010) (quoting *Dietz*, 685 P.2d at 748).

Clover has presented evidence he went to his living room, saw the couch and hoverboard were on fire, threw the flaming hoverboard outside, and doused the remaining area with water. (Doc. 86-1 at 13–14.) The fire was localized to precisely where the hoverboard had been. Lithium-ion batteries are known to ignite when overheated. (Doc. 81-5 at 25–26.) And pictures of the partially-charred hoverboard show the area housing the batteries was burned. (Doc. 85-5 at 2, 5, 9.) If the fire was not caused by a defect in the charging system or batteries, the damage to the hoverboard was unusually localized. Because hoverboards generally do not spontaneously burst into flames when being charged, Clover has sufficient circumstantial evidence (if just barely) to proceed to trial. *See Dietz*, 685 P.2d at 747 ("[C]onsidering all the facts and circumstances, there was a reasonable likelihood that reasonable people might reach different conclusions from the competing inferences.").

In arguing against this "unidentified defect" approach, defendants claim Clover has not eliminated other potential causes of the fire. (Doc. 87 at 4.) They point to the presence of extension cords and other unknown objects that could have been alternative causes of the fire, but which Clover did not investigate, to argue he did not exhaust all possible alternative explanations. (Doc. 87 at 4.) Defendants also argue Clover cannot point to evidence establishing "how the hoverboard was used prior to the fire, how it was stored, or if it was exposed to extreme heat, increased temperatures, water, or dropped during its lifetime." (Doc. 87 at 4.) Clover was not required "to eliminate with certainty all other possible causes of an accident." *Id.* at 748. Strict liability is premised on a recognition that "[t]here will seldom be a case . . . where a person will be able to testify from his personal knowledge that a particular product was sold in a certain defective condition." *Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile*, 640 P.2d 851, 853 (Ariz. 1982) (simplified). Relatedly, it would be unusual to have a case where a plaintiff could definitively rule out every other possible cause. Arizona law does not require that level of

proof and Clover is entitled to proceed to trial on this theory.[1]

### B. Failure to Warn

Clover alleges defendants failed to adequately warn of the risk of improperly charging the hoverboard. To bring a failure to warn claim, Clover must prove lack of an adequate warning made the hoverboard defective and unreasonably dangerous; the hoverboard lacked adequate warnings when it left defendants' control; and defendants' failure to give an adequate warning proximately caused his injuries. *Gosewisch*, 737 P.2d at 379.

In Arizona, "[m]anufacturers generally have a duty to warn consumers of foreseeable risks of harm from using their products." *Conklin v. Medtronic, Inc*., 431 P.3d 571, 577 (Ariz. 2018). Under Arizona law, a warning must apprise the consumer of "the existence and seriousness of the danger sufficient to enable the consumer to protect himself against it." *Brown v. Sears, Roebuck & Co*., 667 P.2d 750, 757 (Ariz. Ct. App. 1983). This determination is "ordinarily a question for the trier of fact." *Stage v. Stage*, No. CV11-0936-PHX-DGC, 2012 WL 443834, at *2 (D. Ariz. Feb. 13, 2012) (quotations omitted).

The parties do not dispute improperly charging a Hover-1 All-Star hoverboard creates a fire risk. (Doc. 80 at 8–10; Doc. 10–14.) They disagree whether defendants failed to adequately warn of the fire risk and if this failure proximately caused Clover's injuries. No party cites to definitive evidence that Clover's charger was sold with or without a warning attached to the charger itself. (Doc. 81 at 4; Doc. 81-5 at 101–103; Doc. 85-3 at 2–3; Doc. 86 at 11.) But both parties agree the user manual says to "[u]se only the supplied charger with this scooter" and later says "[u]se only the charger and charging cable supplied by Hover-1" because use of "any other charger or cable may lead to damage to the product, overheating and risk of fire." (Doc. 87 at 6; Doc. 81-4 at 21–22; Doc. 86 at 12.) Defendants

---

[1] Defendants moved to exclude Clover's expert, Rodolfo Chapa, who offered numerous opinions regarding possible defects. (Doc. 79.) As addressed in the context of Clover's attempts to pursue specific defects, much of Chapa's testimony would not be admissible at trial. But the court need not determine the admissibility of all of Chapa's testimony at this stage. *Long v. TRW Vehicle Safety Sys., Inc*., 796 F. Supp. 2d 1005, 1009 n.5 (D. Ariz. 2011). Defendants' motion to exclude is denied without prejudice and may be renewed at trial consistent with a later order setting a final pretrial conference.

argue these warnings were adequate. (Doc. 87 at 6–7.)

Here, Clover has introduced facts creating a dispute of fact whether defendants' warnings were adequate. Although one warning in the manual cautions users to only use "the supplied charger with this scooter," this admonition does not explain the potential consequences for failure to follow this instruction (Doc. 81-4 at 4). *See Brown*, 667 P.2d at 564 ("Bland instructions which if followed would involve no risk are no substitute for a skull and crossbones warning where the misuse of the product will have lethal results."). Later in the manual there is a warning of the potential risks of using the incorrect charger, but this warning appears in the context of an admonition to "[u]se only the charger and charging cable supplied by Hover-1" without specifying *which* charger provided by Hover-1 must be used, or even referencing that Hover-1 provides different chargers. (Doc. 81-4 at 21–22.) A reasonable juror could find the phrase "charger and charging cable supplied by Hover-1" ambiguous where both chargers were the same color, same length, and had the same charging port that allowed insertion of both chargers. (Doc. 86-2 at 11.) Accordingly, the court "cannot say, as a matter of law," the warnings were "of a degree of intensity that would have caused [Clover] to exercise for his own safety caution commensurate" with the product's risks. *Brown*, 667 P.2d at 565.

The parties also dispute whether defendants' failure to warn proximately caused Clover's injuries. Clover may show proximate cause "by evidence that had a proper warning been given, he would not have used the product in the manner which resulted in his injury." *Gosewisch*, 737 P.2d at 379. Arizona law allows a heeding presumption "that allows the fact-finder to presume that the person injured by product use would have heeded an adequate warning, if given." *D'Agnese v. Novartis Pharms. Corp.*, 952 F. Supp. 2d 880, 890 (D. Ariz. 2013) (quotations omitted). This presumption is destroyed if defendants introduce "evidence that would permit reasonable minds to conclude that the injured party would not have heeded an adequate warning." *Id.*

Defendants argue that because Clover did not read the manual, he would not have heeded an adequate warning even if the manual's warnings were sufficient. (Doc. 80 at 9.)

- 9 -

1  But this assumes a warning in the manual alone would be adequate as a matter of law, an
2  argument for which they do not provide support. Generally, Arizona courts have found the
3  presumption rebutted when plaintiffs read the accompany user manuals or received
4  additional warnings but declined to heed them. *See Golonka*, 65 P.3d at 966 (heeding
5  presumption rebutted where consumer read and ignored manual and also disregarded
6  warning buzzer); *Gosewisch*, 737 P.2d at 380 (heeding presumption rebutted where user
7  did not read manual but also ignored multiple warnings affixed to product). Because
8  defendants have not provided evidence Clover would have ignored an adequate warning if
9  given, they have not rebutted the heeding presumption. Defendants' motion on the failure
10 to warn claim is denied.

### C. Negligence

Clover argues defendants negligently designed the hoverboard. (Doc. 86 at 14.) This type of negligence claim requires a plaintiff "prove that the designer or manufacturer acted unreasonably at the time of . . . design of the product." *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876, 881 (Ariz. 1985). Defendants' reasonableness is evaluated through a risk/benefit analysis, which considers "information known about the product, including reasonably foreseeable dangers, at the date of [design]" and "whether an ordinarily prudent [designer] would have produced and sold the product as it was produced and sold." *Id.* Unlike a strict liability design defect claim, which focuses on whether the *product* was unreasonably dangerous, a negligent design claim addresses whether the defendant's *conduct* was unreasonable. *Golonka*, 65 P.3d at 582. Clover has not pointed to sufficient evidence to establish there is a dispute of fact under this theory.

As best as this court can understand, Clover argues defendants' conduct was negligent because defendants could have designed hoverboards with color-coded chargers to distinguish between voltage levels, a "clear, age-appropriate warning" printed on the hoverboard and packaging to warn users and parents of "the hidden fire risk," and different charging ports that prevented the connection of incorrect voltage chargers or safety mechanisms "that would trigger a warning beep if a higher voltage charger was connected."

(Doc. 86 at 15–16.) But Clover has not "disclosed any evidence regarding the design process" followed when producing the hoverboard or the charger, nor has he pointed to specific acts during the design process that fell below the standard of care. *Philadelphia Indem. Ins. Co. v. BMW of N. Am. LLC*, No. CV-13-01228-PHX-JZB, 2015 WL 5693525, at *16 (D. Ariz. Sept. 29, 2015). Although he has proposed alternative designs, which he speculates would have prevented the fire (though how, he does not support with any facts), he does not provide any evidence showing the failure to employ these alternative designs was unreasonable. "[E]vidence of defect is not sufficient; there must be evidence of unreasonable conduct on the part of Defendant." *Id*. Defendants' motion on this claim is granted.

### D. Damages

Finally, defendants argue they are entitled to summary judgment on Clover's claims for lost wages, lost earning capacity, and future medical expenses because he has not disclosed sufficient evidence to support these claims. (Doc. 80 at 12.) Clover concedes he is not pursuing damages for lost wages or lost earning capacity. (Doc. 86 at 16.) As for future medical expenses, defendants argue he did not provide documents in support of these damages, instead offering to "supplement [his] Disclosure[s] as additional documents become available." (Doc. 80 at 14.) But Clover did provide an expert report of Dr. Stanley Graves who testified to the "necessity and reasonableness of future medical treatment" and himself testified to his symptoms. (Doc. 86 at 17.) Defendants do not dispute the adequacy of these disclosures. Therefore, Clover can still seek to recover future medical expenses.

/
/
/
/
/
/
/

Accordingly,

**IT IS ORDERED** DGL and Walmart's Motion for Summary Judgment (Doc. 80) is **GRANTED IN PART** and **DENIED IN PART** as set forth above.

**IT IS FURTHER ORDERED** DGL and Walmart's Motion to Exclude Rodolfo Chapa (Doc. 79) is **DENIED** with leave to reinstate closer to trial.

**IT IS FURTHER ORDERED** no later than **October 8, 2025**, the parties shall file a joint statement identifying the expected length of trial and dates between March 1, 2026 and July 31, 2026 (excluding Mondays) when all parties, counsel, and witnesses are available for trial.

Dated this 26th day of September, 2025.

_____
Honorable Krissa M. Lanham
United States District Judge